```
FILED
FEB 07 2012
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                        DEPUTY
```

1 │ BENJAMIN L. COLEMAN (California Bar No. 187609)
   │ COLEMAN & BALOGH LLP
2 │ 1350 Columbia Street, Suite 600
   │ San Diego, California 92101
3 │ Telephone No. (619) 794-0420
   │ Facsimile No. (619) 652-9964
4 │ Email: blc@colemanbalogh.com

5 │ MICHAEL PANCER (California Bar No. 43602)
   │ 105 W. "F" Street, 4th Floor
6 │ San Diego, California 92101-6036
   │ Telephone No. (619) 236-1826
7 │ Facsimile No. (619) 233-3221
   │ Email: mpancer@hotmail.com
8 │

   │ Attorneys for Defendant Ralph Inzunza
9 │

10 │                 UNITED STATES DISTRICT COURT

11 │               SOUTHERN DISTRICT OF CALIFORNIA

12 │               **(HONORABLE JEFFREY T. MILLER)**

13 │ UNITED STATES OF AMERICA,        )    Criminal No. 03CR2434-JM
                                      )    Civil No.
14 │              Plaintiff,          )
                                      )
15 │ v.                               )
                                      )    **MEMORANDUM OF LAW**
16 │ RALPH INZUNZA,                   )    **IN SUPPORT OF 28 U.S.C.**
                                      )    **§ 2255 MOTION**
17 │                                  )
              Defendant.              )
18 │                                  )

19 │                 **PRELIMINARY STATEMENT**

20 │        Defendant, Ralph Inzunza, respectfully submits the following memorandum of law in

21 │ support of his 28 U.S.C. § 2255 motion.  Mr. Inzunza's convictions should be vacated under *United States*

22 │ *v. Wilkes*, 662 F.3d 524 (9th Cir. 2011) and *United States v. Straub*, 538 F.3d 1147 (9th Cir. 2008).  Both

23 │ *Wilkes* and *Straub*, which were decided after the trial, demonstrate that the Court should have granted Mr.

24 │ Inzunza's request to immunize Lance Malone so that he could contradict the testimony of Michael

25 │ Galardi, the government's cooperating witness.  In particular, Malone would have directly contradicted

26 │ Galardi's false testimony that Mr. Inzunza received *two* cash payments, testimony that dramatically altered

27 │ the state of the evidence from a case solely involving reported campaign contribution checks to a case that

28 │ included secret cash payments.  Under *Wilkes* and *Straub*, the Fifth and Sixth Amendments were violated

1  and a new trial is required because the government distorted the fact-finding process by rewarding its

2  witness with significant sentencing benefits, while Mr. Inzunza was not allowed to present contradictory

3  testimony that would have exposed the falsity of the cash-payment allegations.  Alternatively, a new trial

4  is required when considering the combination of the *Wilkes/Straub* error with the *Griffin v. California*, 380

5  U.S. 609 (1965) error found by the Ninth Circuit and a *Brady v. Maryland*, 373 U.S. 83 (1963) violation.

6  At the very least, Mr. Inzunza contends that the Fifth and Sixth Amendments require reconsideration of his

7  sentence and that the Court should reduce his sentence to 6 months in custody followed by 6 months of

8  home detention.

9  **STATEMENT OF FACTS**

10         The Court is familiar with the facts of this case, and therefore Mr. Inzunza will only focus

11  on the facts that are most relevant to this motion.  At the beginning of the case, the defense sought

12  discovery from the government as to whether it was alleging cash bribes.  *See, e.g.*, RT at 13-17

13  (December 11, 2003).[1]  The government would neither confirm or deny whether it was making such an

14  allegation.  As a result, on May 24, 2004, Mr. Inzunza filed a motion for a bill of particulars.  CR 183,

15  184.  Throughout the litigation of the bill of particulars motion, the defense claimed that the discovery

16  produced only revealed payments by check in the form of campaign contributions and that the indictment's

17  vague references to "money" should be clarified.  As the Court has previously noted, the government

18  stated in its written response to the motion: "In this case, the defendants have little chance of being

19  unfairly surprised at trial."  CR 550 at 12.  The Court denied the motion for a bill of particulars, *see* CR

20  209, 296, with the government's representations in mind.  CR 550 at 12.

21         On April 4, 2005, Mr. Inzunza filed a motion to sever Malone and to provide Malone with

22  immunity so that he could testify as a defense witness.  CR 308, 309.  Shortly before Mr. Inzunza filed this

23  motion, the government finally produced an FBI report indicating that Galardi claimed that he made

24  $2,000 cash payments to each of the councilmen in March of 2003.  *See* CR 552 at 4.  At this point, the

25  government had not disclosed that Galardi also claimed that he gave the councilmen $10,000 in cash,

26

27

28      [1]      "RT" refers to the Reporter's Transcript.  "CR" refers to the Clerk's Record and is followed
by the entry number in the docket sheet.  "Ex. A" refers to a signed statement submitted by Malone, which
is attached as Exhibit A.  "Ex. B" refers to a declaration submitted by codefendant John D'Intino.

1  through Malone, in April of 2003.  In the motion to sever, Mr. Inzunza contended that Malone would

2  provide exculpatory testimony on Mr. Inzunza's behalf if Malone were tried separately and given

3  immunity.  Specifically, Malone signed a declaration stating:  "At no time did I ever offer or give cash

4  payments to Michael Zucchet and Ralph Inzunza.  At no time did either one of them request anything

5  other than legal campaign contributions.  At no time was there ever asked for or received, a quid pro quo,

6  or anything of value, in return for campaign contributions. . . .  I would so testify if the councilmen were

7  tried first and I was given use immunity for my testimony."  CR 309.

8            At the hearing on the motion, Mr. Inzunza argued that he "would have to move this Court

9  for use immunity for Mr. Malone; I know the government would not make that motion, but it is something

10  we could do."  RT at 97 (April 20, 2005).  The Court denied Mr. Inzunza's request.  The Court reasoned

11  that "Malone provide[d] only a qualified intention to testify, in essence dictating conditions that his trial

12  proceed first or, if not, that he be given use immunity for his testimony.  And as speculated by the motion

13  papers, that was not going to be forthcoming in this case from the government, and as the government

14  attempted I think to inform this Court, that would be a violation of the separation of powers if the Court

15  were to purport to provide that immunity."  *Id.* at 97.  The Court also reasoned that Malone's testimony

16  constituted a general denial of the charges and therefore was not substantially exculpatory.  *Id.* at 98-99.

17  Mr. Inzunza even offered to waive a jury and proceed to a bench trial, in which Malone could have

18  testified under a grant of immunity, but the government declined, insisting on a joint trial where Mr.

19  Inzunza would not be able to present the testimony of Malone.  *See* RT 31-35 (Apr. 26, 2005).

20            At trial, Galardi testified that he gave Mr. Inzunza *two* cash payments through Malone.

21  Galardi testified that Mr. Inzunza received a $2,000 cash payment on March 26, 2003.  RT 40-46 (June 14,

22  2005).  Galardi also testified that Malone gave the councilmen $10,000 in cash on April 15, 2003.  RT 40-

23  41, 45 (June 14, 2005); RT 3742, 3749-51, 3799-3801 (June 16, 2004).  As mentioned above, Malone's

24  pretrial declaration directly refuted Galardi's cash payment testimony.  Approximately one year after the

25  trial, in September 2006, Malone entered a guilty plea to corruption charges in the District of Nevada.

26  Malone submitted the following statement to that court in connection with his sentencing hearing:

27            Contrary to Mr. Galardi's testimony in the San Diego case, he never gave me any
              cash to give to Ralph Inzunza or Michael Zucchet nor did I ever give them any
28            cash. . . .  In addition, neither Ralph Inzunza nor Michael Zucchet ever made any

promises to Mr. Galardi (whom they never even met or spoke with) or to me regarding anything other than a willingness to listen to what we had to say and a lack of bias against sexually oriented businesses.  I intentionally mislead Michael Galardi about the City Councilmen promising or agreeing to support repeal of the law in order to preserve my job and make it look like I had been successful in my lobbying efforts if the law was repealed.  Although I have given up my right to appeal the San Diego verdict as a *quid pro quo* for the plea agreement in this case, and although I did violate campaign finance laws in San Diego with regard to hiding the true source of the contributions to the City Councilmen, the City Councilmen were never told that the money was not that of the persons whose names appeared on the checks.  Nor did any City Councilman promise anything to me in exchange for the contributions to their campaigns.  I am truly sorry that I caused legal problems for the City Councilmen as a result of my lies to them regarding the source of the checks and to Michael Galardi and others regarding what the City Councilmen said to me.

Ex. A.

In April 2011, the Ninth Circuit affirmed Mr. Inzunza's convictions. *See United States v. Inzunza*, 638 F.3d 1006 (9th Cir. 2011), *cert. denied*, ___ S. Ct. ___, 2012 WL 33295 (Jan. 9, 2012).  The Ninth Circuit held that the government's "say it ain't so" closing argument violated Mr. Inzunza's Fifth Amendment rights under *Griffin*, but it held that the constitutional error was harmless. *Id.* at 1021-23. Like this Court, the Ninth Circuit also held that the failure to turn over prior inconsistent statements made by Galardi did not require reversal. *Id.* at 1021.

## ARGUMENT

### I.

**UNDER *WILKES* AND *STRAUB*, MR. INZUNZA'S FIFTH AND SIXTH AMENDMENT RIGHTS WERE VIOLATED BECAUSE GALARDI PROVIDED FALSE TESTIMONY, PARTICULARLY ABOUT CASH PAYMENTS, AND MR. INZUNZA WAS NOT ALLOWED TO CONTRADICT THIS FALSE TESTIMONY WITH IMMUNIZED TESTIMONY FROM MALONE; ACCORDINGLY, A NEW TRIAL IS REQUIRED.**

Two Ninth Circuit cases decided after the trial demonstrate that Mr. Inzunza's Fifth and Sixth Amendment rights were violated when immunity was declined for Malone, who would have directly contradicted Galardi's false testimony on a relevant issue.  In *Straub*, the Ninth Circuit held that "for a defendant to compel use immunity the defendant must show that: (1) the defense witness's testimony was relevant; and (2) either (a) the prosecution intentionally caused the defense witness to invoke the Fifth Amendment right against self-incrimination with the purpose of distorting the fact-finding process; or (b) the prosecution granted immunity to a government witness in order to obtain that witness's testimony, but denied immunity to a defense witness whose testimony would have directly contradicted that of the

1   government witness, with the effect of so distorting the fact-finding process that the defendant was denied

2   his due process right to a fundamentally fair trial." *Straub*, 538 F.3d at 1162.  The Ninth Circuit also

3   clarified that this test is not limited to when the government offers immunity to its witnesses; the test also

4   applies if the government offers its witnesses "substantial incentives such as cash compensation or a

5   reduction of sentence in exchange for their testimony." *Id.* at 1164.

6               In *Wilkes*, the trial, like the one here, occurred before *Straub*, but the Ninth Circuit

7   nevertheless followed its holding in ordering a remand.  Quoting *Straub*, the Ninth Circuit reiterated that,

8   as to the first prong, the "relevance requirement is minimal, and the defendant need not show that the

9   testimony sought was either clearly exculpatory or essential to the defense.'" *Wilkes*, 662 F.3d at 534.

10  "Moreover, the 'test requires only that the proffered defense testimony directly contradicts the government

11  witness's testimony on a relevant issue, not that the testimony would have compelled the jury to exonerate

12  the defendant.' 'The testimony satisfies the test for 'directly contradictory' where the testimony, if

13  believed by the jury, could have supported a finding that the testimony directly contradicted that of the

14  government's witness.'" *Id.* at 534.

15              Under the two-prong test set forth in *Wilkes* and *Straub*, Mr. Inzunza is entitled to a new

16  trial.  Under the first prong, Mr. Inzunza must show that Malone's testimony would have been relevant.

17  As explained above, this is a "minimal" showing, which Mr. Inzunza can clearly meet.  The question of

18  secret, cash payments was certainly a relevant issue.  Galardi testified that Mr. Inzunza received two,

19  secret cash payments through Malone – a $2,000 cash payment in March 2003 and a portion of a $10,000

20  cash payment in April 2003.  Malone would have testified that Mr. Inzunza did not receive any cash

21  payments, thereby directly contradicting Galardi.  Such a direct contradiction is all that is required, and

22  Mr. Inzunza need not show that Malone's testimony would have compelled a jury to exonerate him.  He

23  only needs to show that Malone's testimony directly contradicted Galardi on this relevant issue.

24              Mr. Inzunza can also meet the second prong, as Malone's testimony would have directly

25  contradicted Galardi, who, as the Court has previously acknowledged, was offered significant sentencing

26  benefits under his cooperation agreement.  CR 550 at 15.  The government was permitted to offer

27  significant benefits to its "cooperating" witness, who provided false and damning testimony about two,

28  secret cash payments.  Meanwhile, Mr. Inzunza was not permitted to call his witness, who would have

1  directly contradicted Galardi and testified that Mr. Inzunza did not receive any cash payments. This

2  imbalance distorted the fact-finding process in violation of Mr. Inzunza's constitutional rights. Moreover,

3  the government fought hard to maintain this imbalance, as it refused Mr. Inzunza's request for a bench

4  trial, and the prosecution was not entirely forthcoming with pretrial disclosures about the cash payment

5  testimony. In addition, as set forth in the attached declaration, the government distorted the fact-finding

6  process by instructing its other cooperating codefendant, John D'Intino, to call the payments "bribes"

7  rather than "campaign contributions" so that the defense would not call D'Intino to contradict Galardi and

8  so that the government's theory of the case would not be undermined. *See* Ex. B. In sum, Mr. Inzunza's

9  convictions must be vacated under *Wilkes* and *Straub*, and he should be given a new trial where he can

10 rebut Galardi's false testimony.

11 **II.**

12 **THE COURT SHOULD ORDER A NEW TRIAL WHEN CONSIDERING THE**
**COMBINED EFFECT OF THE *WILKES/STRAUB* ERROR, THE *GRIFFIN***
13 **ERROR FOUND BY THE NINTH CIRCUIT, AND THE *BRADY* VIOLATION.**

14          The Ninth Circuit held that the government violated Mr. Inzunza's Fifth Amendment rights

15 under *Griffin* with its "say it ain't so" closing argument. *See Inzunza*, 638 F.3d at 1021-23. To the extent

16 that the Court is uncertain as to whether the *Wilkes/Straub* error requires a new trial standing on its own,

17 the Court should also consider that error in combination with the *Griffin* and other closing argument error

18 found by the Ninth Circuit. *See, e.g., United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996).

19          Similarly, the Ninth Circuit held that the failure to turn over prior inconsistent statements

20 by Galardi did not require a new trial under *Brady* and *Giglio v. United States*, 405 U.S. 150 (1972)

21 because Galardi was already impeached with other inconsistent statements and in other ways. *See*

22 *Inzunza*, 638 F.3d at 1021. The Supreme Court, however, has recently rejected such reasoning. In *Smith*

23 *v. Cain*, 132 S. Ct. 627 (2012), a prosecution witness identified the defendant as one of the gunmen who

24 shot five of his friends to death. The prosecution failed to turn over the notes of a detective stating that the

25 witness "could not supply a description of the perpetrators other then [sic] they were black males" and that

26 he "could not ID anyone because he couldn't see faces[,]" "would not know them if he saw them[,]" and

27 "could not identify any of the perpetrators of the murder." *Id.* at 629-30. The Court found that the

28 conviction had to be reversed under *Brady* and specifically rejected the argument that the witness was

6                                                             03CR2434

1   impeached with other inconsistent statements because the jury heard that the witness "made other remarks

2   on the night of the murder indicating that he could identify the first gunman to enter the house, but not the

3   others." *Id.* at 630. The Court reasoned: "That merely leaves us to speculate about which of [the

4   witness's] contradictory statements the jury would have believed." *Id.* at 630. Similarly, here, Galardi

5   was the *only* witness to testify about cash payments, and the fact that he may have been impeached with

6   other inconsistent statements and other impeachment material does not avoid the need for reversal under

7   *Brady*. At the very least, the Court should consider the cumulative effect of the *Brady/Smith v. Cain* error

8   with the *Wilkes/Straub* error and the *Griffin* error.

9            Mr. Inzunza also notes that the Supreme Court will be clarifying harmless error review

10  later this Term in *Vasquez v. United States*, ___ S. Ct. ___, No. 11-199, 2011 WL 3608784 (Nov. 28,

11  2011). While Mr. Inzunza contends that it is clear that the combination of the constitutional errors in this

12  case cannot be deemed harmless and require a new trial, *Vasquez* may clarify any uncertainty that the

13  Court may have.

14                                              **III.**

15  **ALTERNATIVELY, THE COURT SHOULD RECONSIDER MR. INZUNZA'S SENTENCE.**

16            **A. Introduction**

17            If this Court does not vacate Mr. Inzunza's convictions, it should at least reduce his

18  sentence. Even if *Wilkes* and *Straub* do not demonstrate that Mr. Inzunza is entitled to a new trial where

19  he can contradict Galardi's false testimony with Malone, the Fifth and Sixth Amendments require the

20  Court to consider Malone's testimony in the context of a new sentencing hearing. Moreover, as

21  mentioned, after the original sentencing, the government produced *Brady/Giglio* material further

22  impeaching Galardi's testimony. Even if the law of the case holds that this new material does not warrant

23  a new trial, *see Inzunza*, 638 F.3d at 1021, this Court should consider it in the context of a new sentencing

24  hearing, particularly in combination with Malone's statements. Mr. Inzunza further contends that the

25  Court should reduce his sentence to a split sentence of 6 months in custody and 6 months of home

26  detention. The jury instructions in this case were consistent with a gratuity offense, and the Sentencing

27  Guideline for gratuity offenses is less onerous than the bribery guideline that was applied by the Court.

28  Under the gratuity guideline, the recommended split sentence is appropriate.

1             **B. Mr. Inzunza's Sentence Should Be Reconsidered Under *Wilkes/Straub***

2           At the time that the Court sentenced Mr. Inzunza, it apparently disbelieved Galardi's

3 testimony about the $10,000 cash payment in April of 2003. CR 550 at 15. At the same time, however,

4 the Court appeared to accept Galardi's claim that Mr. Inzunza also received a $2,000 cash payment in

5 March of 2003. The allegation that Mr. Inzunza received a secret, cash payment was likely an important

6 one when the Court considered what sentence was appropriate for Mr. Inzunza under the facts and

7 circumstances of this case. *See* 18 U.S.C. § 3553(a).

8           While Mr. Inzunza submits that he is entitled to a new trial, he contends that, under the

9 Fifth and Sixth Amendments, the Court should at least hold a new sentencing hearing where Malone can

10 testify under a grant of immunity to contradict Galardi's false testimony. Alternatively, the Court should

11 at least consider Malone's statements contradicting Galardi in the context of a new sentencing hearing. Of

12 course, Malone has flatly denied that Mr. Inzunza received any cash payments. While the government will

13 likely continue to rely on Galardi's false claims, Mr. Inzunza submits that Malone's version is much more

14 credible.

15           As an initial matter, the Court has already found that Galardi's testimony about the $10,000

16 cash payment was not credible, commenting that he was influenced by the benefits he received under his

17 cooperation agreement. As a result, his claim about the $2,000 cash payment is likewise suspect. *See*

18 *Killian v. Poole*, 282 F.3d 1204, 1209 (9th Cir. 2002) ("fundamental inference that if [the cooperator] lied

19 about X,Y and Z, it is quite likely that he lied about Q, R and S"); *see also Lopez-Umanzor v. Gonzales*,

20 405 F.3d 1049, 1059 (9th Cir. 2005) (discussing the principle of "falsus in uno, falsus in omnibus").

21 Meanwhile, Malone's pretrial declaration that Mr. Inzunza did not receive any cash payments was

22 reinforced with his subsequent statement at the time of his sentencing in the District of Nevada. At the

23 time of his sentencing in Nevada, Malone had no incentive to exonerate Mr. Inzunza; to the contrary, he

24 had every incentive to "accept responsibility" for all of his criminal actions. Yet, without any motive,

25 Malone went out of his way to comment that Mr. Inzunza did not receive any cash payments. *See Killian*,

26 282 F.3d at 1210 n. 7.

27           In sum, even if the Court does not believe that a new trial is appropriate under *Wilkes* and

28 *Straub*, it should at least reconsider Mr. Inzunza's sentence, as Mr. Inzunza was denied the right to present

          03CR2434

1  relevant testimony that directly contradicted the government's "cooperating" witness about perhaps the

2  most troubling allegation against him – the receipt of two secret, cash payments.

3  **C. Mr. Inzunza's Sentence Should Be Reconsidered Under *Brady***

4  It is well-established that *Brady* is not limited to the trial context and also applies at the

5  sentencing stage. *See, e.g., United States v. Mikaelian*, 168 F.3d 380, 388-89 (9th Cir. 1999). Indeed,

6  *Brady* itself was a sentencing case. As the Court is aware, after Mr. Inzunza's sentencing hearing, the

7  government produced the O'Melveny memoranda, which further undercut Galardi's testimony,

8  particularly his claim that Mr. Inzunza received a cash payment in San Diego in March of 2003. Even if

9  the law of the case holds that this new information does not entitle Mr. Inzunza to a new trial, *see Inzunza*,

10  638 F.3d at 1021, it nevertheless should be considered at a new sentencing hearing.

11  Indeed, the Ninth Circuit has specifically recognized that even though a prior panel has

12  held that the failure to turn over impeachment information does not require a new trial, that does not

13  resolve the question of whether a new sentence is appropriate. *See United States v. Ross*, 372 F.3d 1097,

14  1108 (9th Cir. 2004) ("*Ross I* made further impeachment of [the cooperator] irrelevant and therefore

15  immaterial with regard to the question of Ross's guilt [but] *Ross I* does not preclude our consideration of

16  [the cooperator]'s credibility as it relates to the factual bases for sentencing"). Contrary to Galardi's trial

17  testimony, the O'Melveny memoranda fail to contain any allegation that Galardi, through Malone, paid

18  Mr. Inzunza $2,000 cash in San Diego in March of 2003. Indeed, Galardi failed to mention this critical

19  fact even though it supposedly transpired just a few months before he was interviewed by his lawyers.

20  This exculpatory information, which was not produced at the time of Mr. Inzunza's original sentencing

21  hearing, reinforces Malone's version, which is that Mr. Inzunza did not receive any cash payments.

22  In sum, the new impeachment material undercutting Galardi's testimony requires the Court

23  to resentence Mr. Inzunza under *Brady*. Particularly when this new information is considered together

24  with Malone's statements, a new sentencing hearing is required.

25  **D. A Split Sentence Is Appropriate Under The Gratuity Guideline And 3553(a)**

26  When the Court originally imposed its sentence, it utilized the November 2002 version of

27  the Sentencing Guidelines and applied U.S.S.G. § 2C1.1, the guideline governing bribery offenses. The

28  Court therefore applied a base offense level of 10, which it increased by 2 levels for more than one bribe,

1  and another 8 levels for payment to influence an elected official.  The Court then departed downward 4

2  levels, arriving at a total offense level of 16 in Criminal History Category 1, and imposed a low-end

3  sentence of 21 months.  RT 339-51 (Nov. 10, 2005).

4         Mr. Inzunza submits that, given the new information thoroughly undermining Galardi's

5  claim of secret, cash bribes, the Court should reconsider its sentence for Mr. Inzunza, and the Court should

6  further analogize to U.S.S.G. § 2C1.2, which governs gratuity offenses.  Indeed, Mr. Inzunza submits that

7  the jury instructions given in this case were more consistent with a gratuity offense than a bribery offense.

8  In particular, section 2C1.2 notes: "This section applies to the offering, giving, soliciting, or receiving of a

9  gratuity to a public official in respect to an official act.  A *corrupt* purpose is not an element of this

10 offense."  U.S.S.G. § 2C1.2 comment. (Background) (2002) (emphasis added).  In this case, the jury was

11 not instructed that it had to find that Mr. Inzunza had a *corrupt* and specific intent to violate the law, an

12 essential element of the bribery offense.  *See, e.g., United States v. Aguon*, 851 F.2d 1158, 1167-68 (9th

13 Cir. 1988) (*en banc*), *overruled on other grounds by Evans v. United States*, 504 U.S. 255 (1992); *United*

14 *States v. Strand*, 574 F.2d 993, 995-96 (9th Cir. 1978).  Instead, the jury was only instructed on a

15 "knowingly" mens rea and was specifically instructed that it did not have to find that Mr. Inzunza intended

16 to violate the law, RT 5374-83 (July 6, 2005), contrary to the corrupt and specific intent requirement.  *See*

17 *United States v. Stein*, 37 F.3d 1407, 1409-10 (9th Cir. 1994).  In denying Mr. Inzunza's theory of defense

18 instruction, the Court also noted that good faith was not a viable defense and that the charged offenses set

19 forth an objective standard, not a subjective one.  RT 5331-32 (July 5, 2005).

20         Accordingly, the jury instructions in this case were more consistent with a gratuity offense

21 than a bribery offense.  As the D.C. Circuit has stated: "A central difference between accepting a bribe and

22 accepting a gratuity is the degree of culpable intent on the part of the recipient; to convict a defendant for

23 accepting a bribe a jury must find that the defendant acted 'corruptly,' whereas to convict for accepting a

24 gratuity the jury need only find that the defendant acted 'knowingly and willingly.'" *United States v.*

25 *Gatling*, 96 F.3d 1511, 1522 (D.C. Cir. 1996).  Here, the jury was instructed according to an objective,

26 knowingly mens rea for a gratuity offense instead of a subjective, corruptly mens rea for a bribery offense.

27         In sum, given that the secret cash payment testimony has been undercut by Malone's

28 information and the late disclosure of *Brady* material, and given that the instructions in this case were

1  more consistent with a gratuity offense, the Court should consider the gratuity guideline. Under the

2  applicable 2002 version of section 2C1.2, the base offense level would be 7, there would be a 2-level

3  increase for more than one gratuity, and an 8-level increase for an elected official. With the 4-level

4  downward departure previously granted by the Court, the resulting offense level is 13. The guideline

5  range is 12-18 months in Category I, and, under the current sentencing table, is in Zone C, which

6  authorizes a split sentence. Mr. Inzunza submits that a split sentence of 6 months in custody and 6 months

7  of home detention is appropriate.

8              Finally, Mr. Inzunza contends that a split sentence is appropriate given all of the factors in

9  section 3553(a). The Court has already considered Mr. Inzunza's history and characteristics with great

10  care, and therefore he only seeks to briefly update the Court on those factors since the time of the initial

11  sentencing hearing. *See Pepper v. United States*, 131 S. Ct. 1229, 1246-47 (2011). In particular, shortly

12  after the sentencing hearing, Mr. Inzunza's son was diagnosed with autism. Mr. Inzunza is truly thankful

13  for the Court's decision to allow him to remain on bail pending appeal, as he was able to attend to his son

14  during these crucial formative years. The recommended split sentence with a home detention component

15  will allow Mr. Inzunza to return to his family earlier and to continue his care for his son. Moreover,

16  during the pendency of the appellate proceedings, Mr. Inzunza devoted himself to counseling and

17  advocating on behalf of parents of children with autism. As a result, the Court could further consider a

18  community service condition of supervised release, where Mr. Inzunza could continue his efforts on behalf

19  of children with autism.

20                                              **CONCLUSION**

21              For the foregoing reasons, the Court should grant Mr. Inzunza's section 2255 motion.

22                                                  Respectfully submitted,

23

24  Dated: February 7, 2012                        BENJAMIN L. COLEMAN
                                                    MICHAEL PANCER
25
                                                    Attorneys for Mr. Inzunza
26

27

28

# EXHIBIT A

My name is Lance Malone. I have entered a plea of guilty in case 2:03 cr 500 LRH (LRL) and am submitting this to the Court and Parole and Probation to explain why I have entered a guilty plea and what conduct of mine has lead to that decision. I understand that the Court will take this into consideration at sentencing in determining the extent to which I accept responsibility for my actions and the timing of that acceptance of responsibility.

From January of 1997 until the end of December 2000 I served as a member of the Clark County Commission, having been elected to that seat in November 1996. During my tenure on the Commission I served honorably and honestly. Despite what another person has said, I never accepted or received anything of value from anyone in exchange for a promise to vote in a certain way on any item or to in any other manner use my influence as a Commissioner in their behalf. Neither was I promised anything in the future from anyone in exchange for any vote or exercise of influence in their behalf. While I did receive campaign contributions during my tenure as a Commissioner I never made any promises to a contributor in exchange for the contribution. If the contribution was received in the form of currency it was reported on the campaign contribution reports as such. Any activity that I have been involved in since leaving public office with persons or entities that had matters before the County Commission during my tenure has in no way been the result of anything that I may have done while a Commissioner.

More specifically, I never was paid any money by or received anything of value from Michael Galardi while I was a Commissioner or later for anything that I did as a Commissioner. Mr. Galardi's contention that he paid me money and gave me money to purchase a motor vehicle

**882** 

while I was a Commissioner is not true.  I received no money from Michael Galardi until I lost my reelection race and went to work for him. While I did go to Friendly Ford with him and Michael Beezley on September 3, 1999, and while I did meet with a salesperson and discuss the equipment and price of a Ford Excursion on that day, only Galardi and Beezley purchased vehicles on that day.   I did not place a deposit on the vehicle until September 17, 1999, and then only put down $300 in cash.  Michael Galardi did not ever give me any money to purchase a vehicle until after I went to work for him and he made payments on a Mercedes Benz for me in 2001.  Although I did ultimately purchase the Ford Excursion and put $9900 cash down on it, that didn't occur until October 29, 1999 and the money was a gift from my father-in-law, Hugo Palacios.  He gave my wife and me the money because we had two children and he felt that we needed a larger and safer vehicle to transport his grandchildren around.  He also gave it to us because we wouldn't allow him to pay for our wedding.

Michael Galardi also contends that he paid me money every month since mid-1999 while I was a County Commissioner. He has said that the arrangements for this payment were made in the presence of two then Clark County Deputy District Attorneys at a luncheon arranged by one of them so that I could be introduced to Mr. Galardi.  While the luncheon took place and was attended by many people, Mr. Galardi is untruthful as to discussions having occurred there about paying me money.  No such discussions occurred there or anywhere else while I was a Commissioner and no payments of any money were made to me by Mr. Galardi or anyone else while I was a Commissioner.

After I lost my reelection bid I became a lobbyist on County Commission matters.  Mr. Galardi was a client of mine and

became my most important client if measured by the amount of money that I made from him or the amount of time that I spent in his behalf. I also represented Aviation Insurance (Ron Hill) seeking to take over the insurance at McCarren Airport (which did not occur) and Larry Katz on a rezoning issue (which did occur).

During the course of my working for Michael Galardi, in the years 2001 and 2002, I paid cash to Erin Kenny (about $25,000 total in increments of $2,000 per month for five months in 2001, $5000 in January 2002 and $10,000 in August 2002), Dario Herrera (about $18,000 total in increments of $3000 over a period of 6 months), and Mary Kincaid-Chauncey ($20,000 in $5,000 increments over a period of less than one year). I also gave Erin Kenny a check for $10,000 as a campaign contribution in November 2002 and Dario Herrera a check for $10,000 made payable to Silver State Voter Contact as a campaign contribution in September 2002. I was also present when Michael Galardi gave $9000 in cash to Dario Herrera in front of the Clark County Building in my car. All of these payments were made with money supplied by Michael Galardi, were directed by him and always were made with an intention and desire to curry favor and corruptly develop influence with the recipients so that they would vote favorably on items in which Michael Galardi was interested or use their influence to assist Michael Galardi in his business. Michael Galardi never told me that he had also given cash to these three people, but neither did he say that he didn't, so I just don't know if he did. Mr. Galardi had a manner of exaggerating and aggrandizing himself about such things and I learned to not believe everything that he said in that regard.

In addition to my unlawful activities on behalf of Michael Galardi in Las Vegas I also was active in lobbying the San

**884**

Diego City Council for his business there. From May 2001 to spring of 2003 I was responsible for giving checks totaling $20,150 to three San Diego City Council members. Many of these checks were made by persons who I knew were reimbursed in cash for the full amount of the checks. The reimbursements were made with cash provided by Michael Galardi. The purpose of acting in that fashion was to create the false impression that campaign finance laws then existing in San Diego were not being violated, as there was a maximum of $250 per person that could be contributed to a candidate. In truth and in fact all of the money was from Michael Galardi. The reason that so much money was contributed to the City Councilmen was Mr. Galardi's and my belief that we would obtain influence with them so that they would support repeal of a law that was perceived by Michael Galardi as detrimental to his business. We tried to make it appear to the City Councilmen that we could raise money lawfully, so we didn't tell them about the ruse.

Contrary to Mr. Galardi's testimony in the San Diego case, he never gave me any cash to give to Ralph Inzunza or Michael Zucchet nor did I ever give them any cash. He did give me cash to give to Councilman Charles Lewis, which I gave him and he returned. In addition, neither Ralph Inzunza nor Michael Zucchet ever made any promises to Mr. Galardi (whom they never even met or spoke with) or to me regarding anything other than a willingness to listen to what we had to say and a lack of bias against sexually oriented businesses. I intentionally mislead Michael Galardi about the City Councilmen promising or agreeing to support repeal of the law in order to preserve my job and make it look like I had been successful in my lobbying efforts if the law was repealed. Although I have given up my right to appeal the San Diego verdict as a *quid pro quo* for the plea agreement in this case, and although I did violate campaign finance

**885**

laws in San Diego with regard to hiding the true source of the contributions to the City Councilmen, the City Councilmen were never told that the money was not that of the persons whose names appeared on the checks. Nor did any City Councilman promise anything to me in exchange for the contributions to their campaigns. I am truly sorry that I caused legal problems for the City Councilmen as a result of my lies to them regarding the source of the checks and to Michael Galardi and others regarding what the City Councilmen said to me.

I realize that I changed my plea in this case close to the time of trial, but it was not for purposes of delay. I attempted to negotiate a consolidated plea bargain in both the District of Nevada and the Southern District of California while represented by my prior counsel and prior to Indictments. I was advised that the prosecutors in the two districts would not negotiate a joint agreement. Once the San Diego Indictment was returned I honestly felt that I was not guilty of the charges because no promises were ever made to me by the City Councilmen in exchange for the contributions. More important to me, however, were the allegations in the Nevada Indictment that I was corrupt when a sitting County Commissioner. It wasn't until shortly before my trial was scheduled to start in Nevada that the prosecutor agreed that I didn't have to admit to that in order to enter a plea agreement. As soon as that concession was made I changed my plea. I am guilty of all that I have plead guilty to and am genuinely sorry for my conduct, the pain that it has caused my family and the general distrust of government that results in the community because of it. I realize the gravity of my mistake and what it has cost my family and me in terms of my future. I only hope that I can someday make up for it to my family and my community.

886 *Lance M. Malone*

11.14.06

# EXHIBIT B

1 | MICHAEL PANCER (California Bar No. 43602)
105 W. "F" Street, 4th Floor
2 | San Diego, California 92101-6036
Telephone No. (619) 236-1826
3 | Facsimile No. (619) 233-3221

4 | Attorney for Defendant Ralph Inzunza

5

6

7

8 |                    UNITED STATES DISTRICT COURT

9 |                   SOUTHERN DISTRICT OF CALIFORNIA

10 |                   **(HONORABLE JEFFREY T. MILLER)**

11

12 | UNITED STATES OF AMERICA,              )      Criminal No. 03CR2434-JM
                                          )
13 |              Plaintiff,                )
                                          )
14 | v.                                     )
                                          )      **DECLARATION**
15 | RALPH INZUNZA,                         )
                                          )
16 |              Defendant.                )
                                          )
17 | —————————————————————————————

18 |         I, John D'Intino, do hereby declare under penalty of perjury as follows:

19 |         1. I was originally charged along with Ralph Inzunza in the above-entitled case. At the same

20 | time I was charged with Mr. Inzunza, I had separate charges involving a weapons case. The weapons case was

21 | an extremely serious case, and I knew I faced a great deal of time in custody in that matter. Hence, it would

22 | be fair to say, given the lengthy sentence I was facing, the government had considerable leverage over me.

23 |         2. I was told by my attorney not to discuss this case until my supervised release was concluded

24 | in November of 2009. I was also hopeful Mr. Inzunza would win his appeal and I would not have to become

25 | involved in this matter. But given that I understand that his appeal has been denied and I am no longer on

26 | supervised release, I feel somewhat more comfortable in contradicting some of the statements attributed to

27 | me by the government and discussing other things that were done by the government to influence my

28 | testimony. I would testify about these matters in open court.

1            3.  It should first be noted that I never understood any campaign contributions that I was

2    involved in that were made to either Ralph Inzunza, Michael Zucchet, or Charles Lewis were bribes.

3    Essentially, we identified Mr. Inzunza as a candidate who we thought would be sympathetic to our cause and

4    decided to assist him.  It was not the other way around, i.e. we contributed money and he then became

5    sympathetic to our cause.  He expressed his sympathies prior to our making any contributions.

6            4.  While I was being debriefed by the Assistant United States Attorneys in this case, I would

7    refer to the monies we gave as campaign contributions as exactly that, "campaign contributions."

8            5.  I was told that the government considered these contributions to be bribes and therefore in

9    the future I was told to refer to the contributions as bribes.  While I was very uncomfortable with this pressure,

10   I did accede to their request and referred to the payments as bribes.  I understand that the reports of my

11   interviews indicated I referred to these payments as bribes.  In my mind, they were not bribes.

12           6.  In addition, there came a time when I was being interviewed at the U.S. Attorney's Office.

13   It should be noted I was in custody from the day of arrest in this case until I completed my sentence.  I was

14   hopeful during this period of time that the government would agree to a bond for me.  I had been told by an

15   Assistant United States Attorney that I would be permitted to be released on bond if my cooperation were

16   satisfactory.  However, I was beginning to doubt that promise.  During the interview at the U.S. Attorney's

17   Office, a very close friend and advisor of mine, John Lane, came to the interview room.  He told me that he

18   had spoken with Michael Wheat, an Assistant U.S. Attorney, and Michael Wheat had assured him and told

19   him he could assure me that, if I continued to cooperate, I would be released at sentencing but that no one

20   wanted to put this matter on the record.  I trust Mr. Lane, and I took comfort in his words.

21           I declare that the foregoing is true and correct.

22

23   Dated: August 12, 2010

24                         John D'Intino

25

26

27

28

**PROOF OF SERVICE**

STATE OF CALIFORNIA )
)
COUNTY OF SAN DIEGO )

     I am employed in the County of San Diego, State of California; I am over the age of eighteen years and not a party to the within action; my business address is: 1350 Columbia Street, Suite 600, San Diego, California 92101.

     On February 7, 2012, I caused a true copy of Memorandum Of Law In Support Of 28 U.S.C. § 2255 Motion upon the interested parties by the method(s) indicated:

Robert Ciaffa
Michael Wheat
Assistant United States Attorneys
880 Front Street, Room 6293
San Diego, California 92101

( x )    (BY MAIL) I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with U.S. postal service on that same day with postage thereon fully prepaid at San Diego, California in the ordinary course of business.

( )    (BY FEDERAL EXPRESS) by using express mail service and causing to be delivered overnight next day delivery a true copy thereof to the person(s) at the address set forth above.

( )    (BY PERSONAL SERVICE) I caused such envelope to be delivered by hand to the offices of the addressee.

( )    (FACSIMILE) I caused such document(s) to be transmitted to the addressee(s) facsimile number noted above. The facsimile machine I used complies with Rule 2003(3) and the transmission was complete without error.

     I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

     Executed on February 7, 2012, at San Diego, California.

_____
Benjamin L. Coleman

4